UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

RONALD A. MACERA, *et al.*,

                              Plaintiffs,

        -against-                                      6:16-CV-668 (LEK/TWD)

VILLAGE BOARD OF ILION, *et al.*,

                              Defendants.

_____

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

        Pro se plaintiffs Ronald and Catherine Macera, residents of the Village of Ilion, New

York ("Ilion" or the "Village"), brought this civil-rights action against the Ilion Board of

Trustees (the "Board"), Village Fire Chief and Code Enforcement Officer James Trevett

("Trevett"), and Village Police Chief Timothy Parisi ("Parisi"). Dkt. Nos. 1 ("Complaint"); 26

("Amended Complaint"). Plaintiffs brought suit under 42 U.S.C. § 1983 alleging violations of

their First Amendment rights to freedom of speech, their Fourteenth Amendment due process

rights, and violations of New York State's Freedom of Information Law ("FOIL"). Compl.; Am.

Compl.

        Now before the Court are the parties' cross-motions for summary judgment. Dkt. Nos.

113 & 114 ("Plaintiffs' Summary Judgment Motion"); 113-3 ("Macera Affirmation"); 113-4

("Plaintiffs' Summary Judgment Memorandum"); 113-5 ("Plaintiffs' Statement of Material

Facts" or "Plaintiffs' SMF"); 110 ("Defendants' Summary Judgment Motion"); 110-1 ("Walsh

Affirmation"); 110-19 ("Defendants' Summary Judgment Memorandum"); 110-20

("Defendants' Statement of Material Facts" or "Defendants' SMF"). Both parties have filed

responses in opposition and replies to those response. Dkt. Nos. 123 ("Plaintiffs' Summary Judgment Response"); 123-1 ("Plaintiffs' Response SMF"); 119 ("Defendants' Summary Judgment Response"); 126 (Plaintiffs' Summary Judgment Reply"); 121 ("Defendants' Summary Judgment Reply"). Plaintiffs have also filed a Motion to Amend, Dkt. No. 112 ("Motion to Amend"), to which Defendants object, Dkt. No. 117 ("Defendants' Opposition to the Motion to Amend").

For the following reasons, Plaintiffs' Motion for Summary Judgment and Motion to Amend are denied and Defendants' Motion for Summary Judgment is granted in part and denied in part.

## II. BACKGROUND

### A. Initial Matters

Before turning to the factual background of this dispute, the Court has a few words for the parties about their filings in this case.

Local Rule 7.1 requires a party moving for summary judgment to file a "Statement of Material Facts." L.R. 7.1(a)(3). This statement:

> "[S]hall set forth, in numbered paragraphs, a short and concise statement of each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established . . . Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion."

Id. Plaintiffs failed to comply with this rule. Plaintiffs' SMF submitted with their Motion for Summary Judgment largely consists of legal conclusions and contains only two citations to the Record. See Pls.' SMF ¶¶ 4, 18. Plaintiffs' Response SMF is similarly sparsely cited, is incomplete, and also fails to comply with Local Rule 7.1. See Pls.' Resp. SMF. For these reasons, and because Plaintiffs filed their response late, Defendants urge the Court to deem

admitted the entirety of Defendants' SMF. Defs.' SJ Reply; see also Black v. Fischer, No. 08-CV-232, 2010 WL 2985081, at *5 (N.D.N.Y. July 1, 2010) (citing Monahan v. N.Y.C. Dep't of Corr., 214 F.3d 275, 292 (2d Cir. 2000) ("Courts in this district have not hesitated to enforce Rule 7.1(a)(3) . . . by deeming facts admitted upon an opposing party's failure to properly respond."). Bearing in mind Plaintiffs' pro se status, the Court declines to deem admitted Defendants' version of the facts in their entirety, even though "Plaintiff[]s['] imprecise citations have, admittedly, left the Court to sift through the cited pages to determine where, or even whether, anything therein actually contradicts the assertions in the corresponding paragraph of Defendant[]s['] [Statement of Facts]." Pistello v. Bd. of Educ. of Canastota Cent. Sch. Dist., No. 16-CV- 212, 2019 WL 1300947, at *2 (N.D.N.Y. Mar. 21, 2019) (Kahn, J.).

For its part, Defendants' briefing, including the statement of facts, wholly ignores several of Plaintiffs' claims and significant portions of their case. This has left numerous facts attested to in Plaintiffs' exhibits undiscussed and, in some cases, undisputed.

Since so much of the Record is unexplained and undeveloped by the parties, and since Defendants have essentially ignored several aspects of Plaintiffs' claims, the factual summary that follows is gleaned largely from the Court's independent review of the Record. As always at the summary judgment stage, the Court "reserves the right to disregard any assertions" made by either party if those "factual assertions . . . are otherwise unsupported in the record." Id. (citing Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 74 (2d Cir. 2001)).

## B. Factual Background

### 1. Setting the Stage

At heart, this case is a dispute between neighbors. Plaintiffs moved to the Village of Ilion in 2007 when they bought a home at 12 English Street. Dkt. No. 110-3 ("Macera Deposition") at

6–7. The following year, a couple named Janne and Joe Lawrence (the "Lawrences") rented the house next door at 14 English Street. Id. at 11, 18.

The houses at 12 and 14 English Street share a driveway. Id. at 17-18. The driveway leads to, respectively, a barn in the rear of 12 English Street and a lean-to garage behind 14 English Street. Id. at 16–18. Provisions in both properties' deeds ensured access to these structures by granting an easement to the other property for use of the driveway. Dkt. No. 110-12.

In 2009, the Lawrences began operating a day care out of their home. Macera Dep. at 18–19. Plaintiffs allege that, starting at this time, the Lawrences allowed children at the daycare to run up and down the shared driveway and enter Plaintiffs' barn. Id. at 23–24. Concerned that they could be legally responsible if any child playing in the shared driveway or in the barn were injured, Plaintiffs shared their concerns with the Lawrences, who allegedly took no action. Id. Plaintiffs then contacted the New York State Office of Children and Family Services ("OCFS") to determine if the Lawrences had a license to operate a day care out of their home. Id. at 20. OCFS confirmed that the Lawrences had the proper license. Id.

In 2011, Plaintiffs wrote a letter to the then mayor of Ilion, Mayor Stevens, to express concerns about the day care and about other purported harassment by the Lawrences, including running a motorcycle outside Plaintiffs' kitchen window and "flip[ing Plaintiffs] off." Id. at 24–25. In a responsive letter, then-Mayor Stevens stated he had concerns about the day care as well and would have them addressed.[1] Id. at 26.

---

[1] Plaintiffs apparently never received this response, but only learned about it after a 2014 FOIL request. Macera Dep. at 26.

Also in 2011, Plaintiffs complained again to OCFS about the Lawrences' day care, which resulted in an inspection by OCFS officials. Id. at 27. OCFS recommended the Lawrences put up a fence to enclose their backyard, which the Lawrences did. Id. Plaintiffs contend that the Lawrences never received a permit to erect this fence. Dkt. No. 113-6 ("Trevett Deposition") at 16. In any event, the fence did not ameliorate Plaintiffs' concerns "because the gate was very sloppy and could be easily opened." Macera Dep. at 28.

In 2012, the Lawrences applied for and received a permit from the Ilion Zoning Board of Appeals ("ZBA") to operate their home occupation day care at 14 English Street. The meeting in which the ZBA considered the Lawrences' application was publicized in the local newspaper and open to the public. Pls.' SJ Resp., Ex. KK-2; Pls.' SJ Mot., Ex. 51. However, Plaintiffs did not know about the meeting and did not attend. Macera Dep. at 33.

Throughout this period, Plaintiffs had other mounting issue with the Lawrences. Primary among these was parking for the Lawrences' day care business. Id. at 52. According to Plaintiffs, customers of the day care would regularly block the shared driveway with their parked cars. Id. Plaintiffs took photos documenting these traffic violations, see Pls.' SJ Mot., Ex. 12 (purporting to show 120 separate parking violations in front of 12 and 14 English Street), and called the police about these violations on approximately eight occasions, Mcaera Dep. at 52. Plaintiffs claim Ilion police never responded to those eight calls, id. at 53, though police records indicated an officer responded on seven of eight occasions, Defs.' SJ Mot., Ex. Q.

### 2. *2013 and early 2014: The Fence and the Litigation*

Things came to a head in June 2013. First on or around June 22, 2013, the Lawrences paved the front yard of 14 English Street, apparently to provide parking to customers of their day

care. Macera Dep. at 47–48. Plaintiffs contend that the Lawrences never received the necessary zoning variance for this paving. Id. at 49–50.

At that time, the Lawrences also decided to relocate their fence. Macera Dep. at 36; Pls.' Resp. SMF ¶ 14. They planned to move the fence so that it ran from the wall separating Plaintiffs' barn and the Lawrences' lean-to garage to the corner of the Lawrences' house, thus enclosing the Lawrences' back yard. Id. at 36–37. Plaintiffs allege that they became aware of the Lawrences plans to relocate the fence when Joe Lawrence "threaten[ed] us . . . and . . . claimed that he would put [the fence] straight down the middle of the driveway because he could do whatever he wanted to do because he had people in the Village that would support them." Macera Dep. at 38.

<u>a.</u> <u>Communications with Trevett</u>

In response to the Lawrences' plans, Plaintiffs took action. On June 26, 2013, they emailed the general Village email address and asked for the name and contact officer for the "Codes/Zoning enforcer." Dkt. No. 16 ("Plaintiffs' Resp. to Motion to Dismiss" or "Plaintiffs' MTD Response") at 76. Informed that Trevett was the Village's Codes Enforcement Officer, they wrote to him on June 27, 2013 to notify him of the Lawrences' plans, how those plans would violate the easement provision in their deed, and how the Village would be responsible if they allowed this violation of Plaintiffs' deed to go forward. Macera Dep. at 38–39; Defs.' SJ Mot., Ex. L. After a phone call at some time after Plaintiffs' letter, Trevett replied in writing on July 19, 2013 and informed Plaintiffs that the Village did "not take sides" in property disputes between private parties and that this was a "civil matter" "to be taken up in a court of law." Pls.' SJ Mot., Ex. 46 at 4. Plaintiffs then emailed Trevett asking for the "zoning ordinance provisions regarding daycare business[es] in residential area[s]," to which he replied on July 23, 2013 with

a copy of the regulations governing the ZBA. Pls.' MTD Resp. at 77. Plaintiffs followed up shortly thereafter, asking for more information about the Village zoning laws or a record that English Street had been properly zoned to have a day care business. Id. at 78. Trevett replied on August 19, 2013 and told Plaintiffs that they would need to contact "Linda Coffin our Village Clerk, as she does all the zoning board paperwork and . . . has the minutes of the meeting that the daycare was approved." Id. In the meantime, the Lawrences relocated the fence, without a permit. See Macera Dep. at 37–38. [2]

### b. Communications with Parisi

While Plaintiffs were communicating with Trevett, on July 25, 2013, they emailed the Village email address again and, apparently seeking to discuss the parking violations on English street, asked for the contact person for the Village Traffic Commission. Pls.' SJ Mot., Ex. 15 at 1. On July 29, 2013, Parisi emailed back and told Plaintiffs they could direct their concerns to him "for Traffic Commission consideration." Id. at 2. On July 30, 2013, Plaintiffs responded to voice concerns about the newly installed parking lot in front of the Lawrences' house at 14 English Street, including cars parked over the sidewalk and harassment from the Lawrences and their clients. Id. at 3. Plaintiffs also attached photos of alleged parking violations. Id. at 4–8. Parisi responded on August 1, 2013 and stated that the Lawrences had lawfully paved their front yard, but that "the Police Department will make every effort to enforce the parking ordinances." Id. at 9. Parisi further stated that he would "instruct patrols to monitor the parking" and "as the violators are ticketed, it should abate parking violations." Id. Plaintiffs replied on August 2, 2013, reiterating their concerns, but commenting that "you [Parisi] and Chief Trevett have been nothing but professional, courteous and understanding." Id. at 10.

---

[2] Defendants do not dispute this point.

Plaintiffs continued to communicate with Parisi through autumn of 2013. On October 26, 2013, Plaintiffs emailed Parisi and described how an Ilion police officer had failed to ticket a vehicle parked partially on the sidewalk in front of their house. Pls.' MTD Resp. at 42. Parisi wrote back on November 1, 2013 to say that "in response to your most recent email," he had found the officer's report, and the officer had noted that the car did not fully block the sidewalk. Id. at 14. Finally, on March 23, 2014, Plaintiffs emailed Parisi to thank for him "returning a call to our attorney and for patrol . . . violations." Id. at 17. They noted that they had called the police on Friday and one vehicle received a ticket. Id.

### c. Lawrence v. Macera: The State Court Litigation

In the meantime, relations with Plaintiffs' neighbors had worsened. On July 18, 2013, the Maceras sent a letter to the Lawrences directing them to remove the fence that was in "direct violation of the property deed easement stipulation" and stating that if the fence were not gone within 48 hours, she would instruct her attorney to file a civil suit against the Lawrences. Pls.' SJ Resp., Ex. CC. On July 29, 2013, Plaintiffs' attorney, Mary Iocovozzi ("Iocovozzi") wrote to the Lawrences asking them to remove the fence. Id. at CC-1. On August 15, 2013, Daniel Burgess ("Burgess"), an attorney with Hage & Hage ("H&H") and counsel for the Lawrences responded to Iocovozzi. Id. at CC-2. He disagreed with Plaintiffs' interpretation of the easement provision in their deed and countered that Plaintiffs had been harassing the Lawrences and needed to stop. Id. Neither party filed a civil suit at that time.

Then, on November 11, 2013, Plaintiffs posted a lengthy blog post online describing at length their troubles with their neighbors that had lasted "almost 4 yrs" and attached numerous photos of "illegally parked" cars and children at the Lawrences' day care "playing between the house." Pls.' SJ Mot., Ex. C. The next day, Burgess sent a letter to Iocovozzi demanding that

Plaintiffs take the blog down, publish a retraction, and cease to defame them. Pls.' SJ Resp., Ex. CC-4. On December 12, 2013, the Lawrences filed a civil action in the Herkimer County Supreme Court (the "state court suit") seeking a temporary restraining order ("TRO") enjoining the Maceras from maintaining their blog, posting online about the Lawrences, and making "frivolous complaints" to local police, OCFS, and other law enforcement agencies. Pls.' SJ Mot., Ex. 29. The Court granted the TRO on January 7, 2014. Id. Sometime between January 7 and January 23, Plaintiffs installed exterior cameras on their home, at least some of which were directed at the Lawrences house or parking lot. Macera Dep. at 65. On January 23, the Herkimer County court modified the TRO to enjoin Plaintiffs from operating these cameras. Pls.' SJ Mot., Ex. 30.

For several years prior to this suit, H&H had been hired by the Board to act as the Village Attorney for Ilion. Pls.' SJ Mot., Ex. 18 at 3. Sometime in February, Plaintiffs evidently learned that the law firm they were litigating against also served in the Village Attorney role. On February 10, 2014, Iocovozzi wrote to Burgess to express concern that H&H had a conflict of interest, in particular because Plaintiffs had complained to Village officials about the Lawrences, who might turn to H&H for counsel. Pls.' SJ Resp., Ex. CC-6. Burgess replied on February 12, 2014 stating there was no conflict and H&H would not recuse itself. Pls.' SJ Resp., Ex. CC-7. Additionally, at a same day Board meeting, the Board entered into an executive session to discuss a "possible land-litigation situation," but provided no more information about with litigation they discussed. Id. After the executive session, Burgess disclosed to the Board that H&H was representing the Lawrences in the state court suit and the Board voted to find "no conflict of interest" in that representation. Pls.' SJ Mot., Ex. 18 at 11.

Back in court, on February 21, 2014, the Appellate Division of the Supreme Court vacated the TRO. Pls.' SJ Resp., Ex. AA. Around this time, Iocovozzi moved to disqualify H&H from the state court suit. In response, Burgess submitted an affidavit to the court in which he attested that the Village and the Lawrences had given informed consent to H&H's representation, that H&H did not provide any advice to the Village that bore on Plaintiffs' suit against the Lawrences, and that a line item he had billed to the Village for research on the Village code was solely to ensure that "the Village and the Lawrences did *not* have 'differing interests.'" Defs.' SJ Mot., Ex. P. (emphasis in original). Additionally, Burgess submitted an affidavit from then-mayor Beth Neale, who swore that "the Village has no interest, financial or otherwise" in the state court suit, nor "in whether the Lawrences or Maceras prevail." Defs.' SJ Mot., Ex. O. The motion to disqualify was never ruled on, as the parties agreed to a consent order on March 26, 2014. Pls.' SJ Mot., Ex. 18 at 14–23.

### 3. 2014 to 2016 Events

In July 2014, the Lawrences moved from 14 English Street to a home elsewhere in Ilion, relocating their day care in the process. Macera Dep. at 34. 14 English Street remained vacant for several months thereafter, and around March or April of 2015, the owner of 14 English Street removed the fence. Id. at 41. On July 17, 2014, the ZBA held a hearing to consider the Lawrences' new application for a variance permit to operate their day care in their new location. Pls.' SJ Mot., Ex. 51. This meeting too was advertised in the local paper and open to the public, though Plaintiffs apparently did not know about it and did not attend. Id.

After the Lawrences moved, Plaintiffs' troubles with 14 English Street seem to have abated. Their dispute with the Village appears to have continued though, largely through

Plaintiffs' use of New York's FOIL provisions to obtain information about Village processes and code enforcement.

### a. FOIL Requests

Plaintiffs' first FOIL request dates from August 19, 2013, when Plaintiff attempted to secure the minutes of the ZBA meeting where the Lawrences' first day care application was approved. Pls.' SJ Resp., Ex. KK. From then on, Plaintiffs made two requests in 2014, six in 2015, two in 2016, and six in 2017. Pls.' SJ Resp., Exs. KK to KK-19. At least six of these requests were denied because no records existed. Of note, Plaintiffs requested records of inspections of day cares for compliance with the fire code from 2007–2015, only to learn that the records did not exist. Pls.' SJ Resp., Ex. JJ. Plaintiffs later requested the same information for 2016 and received records of 14 inspections. Also, when Plaintiffs requested the zoning permits granted to home day cares in the Village, they received from the Village a page with handwritten notes on it saying, "Talked to Lawrences about fence in back yard – no permit required."

Over time, these emails grew increasingly testy, as Plaintiffs regularly appealed any FOIL denials to the appeals body—the Board—and began to point out numerous alleged violations of FOIL and other New York state laws, such as the open meetings law. See, e.g., Pls.' SJ Resp., Exs. KK-18 to -19.

### b. Interactions with Mayor Leonard and the Letter of Intent

Because the Board heard appeals of denied FOIL requests, Plaintiffs had several interactions with Village Mayor Terry Leonard ("Leonard") in 2014 and 2015. On December 9, 2014, Plaintiffs had a phone conversation with Leonard regarding a FOIL appeal. Pls.' MTD Resp., Ex. N. Then in early January 2015, Plaintiffs and the Mayor arranged a meeting at which Plaintiffs could describe their "grave concerns" regarding the Village. Id. at 14–16. They met on

January 14 and, on January 15, Plaintiffs emailed Leonard to thank her for meeting with them and to explain further their concerns about H&H, the TRO, and a lack of parking enforcement by Ilion police. Id. at 17. Plaintiffs met with Leonard again in early March regarding their FOIL appeal, this time joined by "the villages new attorney" so that the attorney could "get a complete background of [Plaintiffs'] case." Id. at 25–26.

These meetings apparently failed to allay Plaintiffs' distrust of the Board. On June 3, 2015, Plaintiffs sent the Board a notice of their intent to sue the Village in federal court for violations of the Fifth and Fourteenth Amendments. Pls.' SJ Mot., Ex. 3. However, as the instant action was not filed until June 14, 2016, Plaintiffs evidently did not take immediate action on their letter.

<h3>c.  The Summer 2016 incident</h3>

Starting in 2016, Plaintiffs started to develop concerns about a new neighbor named Mark Lyman ("Lyman") who lived at 16 English Street. On March 16, 2016, Plaintiffs emailed Leonard to complain that Lyman's house was in such disrepair that it posed a health hazard. Pls.' MTD Resp., Ex. N at 52. They also stated that Trevett had spoken with the owner, but the owner had not received a citation. Id. Apparently Lyman's behavior did not improve, because on June 1, 2016, Plaintiffs called the fire department to report that Lyman was burning hazardous materials in his back yard. Id. at 60; see also Pls.' SJ Mot., Ex. 23. The next day, Plaintiffs emailed Leonard with a "a formal codes violation complaint," stating that Lyman had been burning "demolition debris" and garbage behind his house generating "poisonous fumes" that put the neighborhood's "health in harms way." Id. at 54–56. Leonard responded the same day, thanking Plaintiffs for the information and CCing Trevett. Id. at 57. Nearly three weeks later, on June 20, 2016, Trevett mailed Lyman a letter ordering him to cease burning construction material

in his yard. Id. at 61. This letter failed to stymie Lyman, as Plaintiffs emailed Leonard again on June 24, 2016 to complain of the same problem and then again on July 7, 2016. Pls.' MTD Resp., Exs. S-Z at 108–09. On June 24, 2016, Plaintiffs also filed this action.

Later, in December 2016, Plaintiffs received a production of documents from the Lawrences counsel in the state court suit. Pls.' SJ Mot., Ex. 24 at 22. Included in this production was a 2016 email between Parisi, Leonard, and defense counsel in the present case (the "litigation email"), none of whom are parties to the state court suit. Id. at 3. This email described a phone call Plaintiffs placed to counsel in this case in which she stated that an alleged employee of the Lawrences day care friended her on facebook in an attempt to intimidate her. Id. at 22. Counsel stated that he "thanked her for the call and gave her no advice or direction," and then emailed Parisi and Leonard to give them "a heads up." Id.

### C. Procedural History

Plaintiffs initiated this action on June 14, 2016. Compl. While Plaintiffs' Complaint was not a model of clarity, it generally alleged two constitutional violations. First, Plaintiffs alleged First Amendment retaliation, namely, that Defendants punished Plaintiffs' exercise of their first amendment rights by failing to enforce zoning regulations against the Lawrences' day care. See, e.g., Compl. ¶¶ 9, 14, 16, 19, 21. Second, Plaintiffs alleged violations of their Fourteenth Amendment due process rights. While the basis for these violations is not entirely clear, Plaintiffs appear to allege violations based on the failure of Village officials to enforce zoning regulations against the Lawrences, on Parisi's failure to investigate and punish parking violations on English Street, and on Defendants' alleged provision of false information about Village zoning regulations to Plaintiffs. See, e.g., Compl. ¶¶ 6, 12, 14, 21, 31. Lastly, the Complaint alleged that certain of their FOIL requests had been illegally denied, Compl. ¶ 29, though it is

unclear if Plaintiffs raised the FOIL issue as an alternative basis for their due process claim or as a separate, pendent state law claim, see Compl. ¶ 1 (bringing action solely under 42 U.S.C. § 1983). In total, Plaintiffs demanded $7.5 million in damages. Compl. ¶ 34.

Defendants subsequently moved to dismiss the instant action under Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 11 ("Motion to Dismiss"). On March 30, 2017, this Court issued a Memorandum-Decision and Order denying Defendants' motion with respect to Plaintiffs' First Amendment claims but granting the motion as to Plaintiffs' due process and FOIL claims. Dkt. No 22 ("March 2017 Memorandum-Decision and Order"). The Court granted Plaintiffs thirty days in which to amend their Complaint and cure the defects in the due process and FOIL claims, and the Court instructed Plaintiffs that an "amended complaint, . . . if filed[,] shall supersede and replace in its entirety the original Complaint, [and] must also be a complete pleading setting forth all of the claims that Plaintiffs want the Court to consider as a basis for awarding relief." Mar. 2017 Mem.-Decision and Order at 15.

Plaintiffs timely filed their Amended Complaint. The Amended Complaint reiterates Plaintiffs' claim that Trevett violated Plaintiffs' due process rights by failing to stop the Lawrences from erecting the fence, Am. Compl. at 6–8, and it alleges several new grounds for Plaintiffs' due process claims, including that the permits issued to the Lawrences' day care violated New York Social Services Law § 390 (establishing the license requirements for day cares) and that Trevett failed to notify Plaintiffs of the Lawrences' hearings in front of the ZBA in either 2012 or 2014, Am. Compl. at 1–5. Plaintiffs further complain that they "have had issues [with] this Village . . . concerning a few requests made under FOIL." Am. Compl. 8–13. Despite the Court's admonition that an amended complaint must be a "complete pleading setting forth" all of the Plaintiffs' claims, the only allusion in the Amended Complaint to Plaintiffs' First

Amendment claims comes when Plaintiffs allege that the Village threatened and intimidated Plaintiffs through the letters H&H sent in its capacity as the Lawrences' attorney in the lead-up to the state court suit. Am. Compl. at 7.

Defendants filed an answer, Dkt. No. 28, and the case proceeded to discovery, during which the parties engaged in mandatory mediation, paper discovery, and nine depositions. Defs.' Opp'n to Mot. to Am. ¶ 9.

After discovery closed, Defendants' filed their Motion for Summary Judgment on September 7, 2018. In that Motion, they argue that the Court should grant them summary judgment because: (1) Plaintiffs failed to seek the proper remedy (injunctive relief) against a proper defendant (the Lawrences); (2) the case is moot because the fence was removed prior to the commencement of this suit; (3) the Amended Complaint does not allege sufficient additional facts to revive Plaintiffs' dismissed due process claim; (4) the Amended Complaint does not allege sufficient additional facts to revive Plaintiffs' dismissed FOIL claim; (5) there is no evidence of retaliatory animus sufficient to support Plaintiffs' First Amendment Retaliation claim; and (6) Trevett, Parisi, and the Village are entitled to qualified immunity. Defs.' SJ Mem. at 1.

Also on September 7, 2018, Plaintiffs filed a Motion for Summary Judgment. In their Motion, Plaintiffs provide no argument regarding their First Amendment or FOIL claims, but allege additional grounds for their due process claims. See generally Pls.' SJ Mot. First, Plaintiffs argue that they "are entitled to Summary judgment of Due Process Violation, by establishing and maintaining a conflict of interest, and taking of our Property [sic]." Pls.' SJ Mem. at 1. The Conflict of interest claim appears to be that the Village "interfered with [Plaintiffs'] due process" by giving "consent of 'no conflict' [sic]" to H&H's service as Village Attorney while

simultaneously representing the Lawrences. Pls.' SJ Mem. at 3. The "taking" allegation is not explained, but appears to be a reiteration of Plaintiffs' statement in the Amended Complaint that, by failing to prevent the erection of the fence, the Village "render[ed] [Plaintiffs'] entire property over to the day care." Am. Compl. at 7. Further, Plaintiffs also argue that they are entitled to Summary Judgment "for failure to train/educate, allowing a fraudulent representation of a Village of Ilion Official, [and] for knowingly and intentionally allowing Defendant Trevett assist the Lawrence's repeatedly abusively have power over our entire property since 2011 [sic]." Pls.' SJ Mem. at 5. The failure to train allegation appears to specifically reference Trevett. Id. at 11 ("The Village Board fails grossly at training employees . . . for they allowed Defendant Trevett, to endanger to entire community . . . .").

On the same day, Plaintiffs also filed what appeared to be a Motion to Amend. On October 2, 2018, Defendants filed a Response in Opposition to the Motion to Amend, Dkt. No. 117, to which Plaintiffs replied, Dkt. No. 126. Additionally, both parties filed Responses in Opposition to the opposing party's Motion for Summary Judgment, Dkt. Nos. 119; 123, and Replies, Dkt. Nos. 121; 126.

Within its myriad allegations, Plaintiffs' Response appears to allege yet more bases for their due process claims, specifically that the Village codes available online were incomplete and the complete codes were unavailable, Pls.' SJ Resp. at 13, 20, and that when the Herkimer County Supreme Court issued the TRO in the state court suit, "Plaintiffs were violated of the Civil rights to be heard . . . [and] this was an outrageous abuse of procedural Due Process [sic]." Id. at 9–10. It also elaborates on Plaintiffs' FOIL claims, including that "FOIL [w]as used in a fashion to continue the line of retaliation, as the [Village Board] is in clear violation of the legislature intent of FOIL [sic]." Id. at 12.

## III. Legal Standard

### A. Standard for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods.,

Inc., 530 U.S. 133, 150 (2000). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). Finally, where a party is proceeding pro se, the court must "read his supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994); accord Soto v. Walker, 44 F.3d 169, 173 (2d Cir. 1995).

### B. Legal Standard Governing Claims Under § 1983

In order to state a claim pursuant to § 1983, a plaintiff must allege "(1) that some person has deprived him of a federal right, and (2) that the person who has deprived him of that right acted under color of state . . . law." Velez v. Levy, 401 F.3d 75, 84 (2d Cir. 2005) (quoting Gomez v. Toledo, 446 U.S. 635, 640 (1980) (internal quotations omitted)); United States v. Int'l Bhd. of Teamsters, 941 F.2d 1292, 1295–96 (2d Cir. 1991) ("Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes 'state action.'"). "Section 1983 is not itself a source of substantive rights[,] but merely provides a method for vindicating federal rights elsewhere conferred[.]" Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir. 2004) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979) ).

## IV.   Discussion

### A. Cross Motions for Summary Judgment

Because Plaintiffs' filings contain many allegations, the Court will take a moment to lay out more concisely their legal claims in this action. Read with the liberality due a pro se

plaintiff's filings, the Court believes the following allegations in Plaintiffs' papers merit discussion:

First, Plaintiffs challenge the Village's denial of their FOIL requests under either New York law or the due process clause of the Fourteenth Amendment. See Am. Compl.

Second, Plaintiffs allege a violation of their due process rights by: (a) Parisi for failing to enforce parking and traffic laws on their street; (b) Trevett for failing to enforce the zoning and fire codes against the Lawrences and Lyman; and (c) the Village for failure to enforce local ordinances, waiving an alleged conflict of interest in H&H's simultaneous representation of the Village and the Lawrences, colluding with the Lawrences to sue Plaintiffs in state court, failing to properly train Village employees, preventing Plaintiffs from attending meetings of the ZBA, and "taking" their property.[3]

Third, Plaintiffs bring a First Amendment retaliation claim, arguing that Parisi, Trevett, and the Village retaliated against Plaintiffs by ignoring their complaints, declining to enforce Village laws against Plaintiffs' neighbors, denying their FOIL requests, and preventing Plaintiffs from accessing the Village codes.[4] They also allege a failure to train.

---

[3] Though the Complaint nowhere specifies whether Plaintiffs alleged substantive or Procedural due process violations, in the March 2017 Memorandum-Decision and Order the Court construed the Complaint to be raising only procedural due process claims. Mar. 2017 Mem.-Decision and Order at 12–14. Plaintiffs appear to confirm this interpretation of their claims in their Response to Defendants' Motion for Summary Judgment. Pls.' Resp. at 9 ("Plaintiffs believe we have proven our Procedural Due Process on several levels"). Therefore, the Court will analyze Plaintiffs' claims only under procedural due process.

[4] Plaintiffs did not explicitly include their First Amendment claims in their Amended Complaint. See generally Am. Compl. Though "[i]t is . . . generally the case that [a]ll causes of action alleged in an original complaint which are not alleged in an amended complaint are waived," Ruggiero v. City of Cortland, N.Y., No. 17-CV-790, 2019 WL 1978623, at *3 (N.D.N.Y. May 3, 2019) (citations omitted), and though the Court warned Plaintiffs to include all causes of action and bases for relief in their Amended Complaint, Mar. 2017 Mem.-Decision and Ord. at 15, because of Plaintiffs' pro se status and Plaintiffs' explanation that they thought

The Court interprets Plaintiffs' papers as bringing claims against Trevett and Parisi in their personal and official capacities and against the Village Board in its official capacity, meaning against the Village itself.[5] See Frank v. Relin, 1 F.3d 1317, 1326 (2d Cir. 1993) ("[W]hen the face of a complaint fails to state clearly whether a government official is being sued in his official capacity, or his individual capacity, or both, courts look to '[t]he course of proceedings.'") (quoting Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985)); see also Dkt. No. 113-7 ("Leonard Deposition") at 5 (Plaintiffs Leonard whether the Village was being sued as an entity and Leonard agreeing that was the case).

As noted above, Defendants raise six arguments their Motion for Summary Judgment, including that Plaintiffs' previously dismissed claims should stay dismissed because Plaintiffs "offered no additional relevant factual allegations to substantiate their claim of a violation of procedural due process" or FOIL. Walsh Decl ¶¶ 60, 63. Because these claims fail for other reasons, the Court need not address whether Plaintiffs alleged sufficient facts in their Amended Complaint to satisfy the pleading standard with regard to these claims.

The Court will examine Plaintiffs' claims in turn and Defendants' arguments where they are relevant.

---

the Court had "accepted" their First Amendment claims in the March 2017 Memorandum-Decision and Order, Pls.' SJ Reply at 2–3, the Court will consider Plaintiffs' First Amendment claims, see Tracy v. Freshwater, 623 F.3d 90, 101 (2d Cir. 2010) (explaining that "a pro se litigant . . . is likely to forfeit important rights through inadvertence if [s]he is not afforded some degree of protection").

[5] Though the papers do not say explicitly that Plaintiffs sue Trevett and Parisi in their personal capacities, this must be the case because suing them in their official capacities alone would be equivalent to suing the Board in its official capacity, thus rendering their presences in the case redundant. See Lore v. City of Syracuse, 670 F.3d 127, 164 (2d Cir. 2012) ("A claim asserted against an individual in his official capacity . . . is in effect a claim against the governmental entity itself.").

*1. FOIL*

Plaintiffs FOIL-based claims must be dismissed for the reasons that follow.

In its November 2017 Memorandum-Decision and Order, the Court noted that "it is far from clear to the Court that Plaintiffs actually intended to bring a state-law challenge to the denial of their FOIL requests, since they purported to bring this action only under § 1983." See Nov. 2017 Mem.-Decision and Order at 14. The Court then dismissed the FOIL claim, explaining that "even if [Plaintiffs'] Complaint could be construed to assert [a state-law challenge to the denial of their FOIL request], it would fail, because Plaintiffs seek only monetary damages . . . and 'FOIL does not give rise to a private cause of action to recover money damages.'" Id. at 14 (quoting Jenn-Ching Luo v. Baldwin Union Free Sch. Dist., No. 12-CV-6054, 2013 WL 4719090, at *3 (E.D.N.Y. Sept. 3, 2013)).

Plaintiffs subsequent filings have failed to clarify their claim. See Am. Compl. (specifying no cause of action while largely repeating, at greater length, FOIL allegations found in the Complaint); Pls.' SJ Mem. (failing to discuss FOIL); Pls.' SJ Resp. at 12–18 (describing how the Village Board allegedly violates FOIL). But throughout this litigation, Plaintiffs have never wavered from their demand for damages and have never demanded injunctive relief. See Compl. ¶ 34 (demanding $7,500,000); Am. Compl. (containing no prayer for relief); Pls.' SJ Mot., Ex. 20 (settlement offer from Plaintiffs to Defendants for $580,000); Pls.' SJ Mem. at 12 (demanding $3,542,000). Since Plaintiffs have failed to clarify their FOIL claim or amend their demand for damages, the Court dismisses any state-law FOIL claim Plaintiffs purport to bring for the same reasons described in the November 2017 Memorandum-Decision and Order.

Alternatively, to the extent Plaintiffs' FOIL claims are brought solely under § 1983, they also fail. "Courts in this District have repeatedly recognized that a section 1983 action is not the

proper vehicle for bringing a FOIL claim." <u>Hall v. Benniger</u>, No. 19-CV-85, 2019 WL 2477994, at *2 (N.D.N.Y. Mar. 4, 2019), <u>report and recommendation adopted</u>, No. 19-CV-85, 2019 WL 1760050 (N.D.N.Y. Apr. 22, 2019) (Kahn, J.). "The appropriate vehicle for challenging denials of access guaranteed by the New York Freedom of Information Law is a state court proceeding pursuant to New York C.P.L.R. Article 78 upon exhaustion of administrative remedies." <u>Schuloff v. Fields</u>, 950 F. Supp. 66, 67–68 (E.D.N.Y. 1997).

For this reason, Plaintiffs' claims regarding denials of their FOIL requests are dismissed.

### 2. Due Process

In the November 2017 Memorandum-Decision and Order, the Court dismissed Plaintiffs' due process allegations for failing to state a cognizable claim, but granted leave to amend so that Plaintiffs could remedy the defects. Nov. 2017 Mem.-Decision and Order at 12-15. Defendants urge this Court that Plaintiffs' due process claims should once again be dismissed because Plaintiffs have still not raised a cognizable claim. The Court agrees.

Before turning to Plaintiffs' due process claims, the Court will discuss § 1983's state action requirement. Plaintiffs' filings make numerous allegations against both the Lawrences and H&H attorneys, but because none of those individuals are state actors, their conduct cannot form the basis for a § 1983 violation. <u>See</u> <u>Am. Mfrs. Mutual Ins. Co. v. Sullivan</u>, 526 U.S. 40, 50 (1999) ("§ 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful.") (quotations omitted).

Reading their submissions generously, Plaintiffs attempt to satisfy the state action requirement by suggesting that the Lawrences' and H&H's conduct is "fairly attributable to the State." <u>Lugar v. Edmondson Oil Co., Inc.</u>, 457 U.S. 922, 937 (1982); <u>see also</u> Pls.' SJ SMF at 3 ("The Village Attorney with Village support and the daycare launched a lawsuit . . . ."). An

alleged due process violation is attributable to the state "if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" Ogunbayo v. Montego Med. Consulting P.C., No. 11-CV-4047, 2012 WL 6621290, at *6 (E.D.N.Y. Sept. 18, 2012), report and recommendation adopted as modified, No. 11-CV-4047, 2012 WL 6625921 (E.D.N.Y. Dec. 19, 2012) (quoting Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001). After reviewing the Record and drawing every permissible inference in favor of the Plaintiffs, the Court cannot find that the Lawrences' and H&H's behavior "may be fairly treated as that of the [Village] itself."

To begin, 2014 Mayor Beth Neale—who is not a party to this suit—stated in a sworn affidavit that "[t]he village has no interest, financial or otherwise, in [the] litigation [between the Lawrences and the Maceras]," and "[t]he Village has no interest in whether the Lawrences or Maceras prevail"). Additionally, H&H attorney Daniel Burgess affirmed in a 2014 sworn affidavit that H&H's roles as Village Attorney and counsel for the Lawrences were completely separate. Defs.' SJ Mot., Ex. P ¶ 12; see also Emanuel v. Griffin, No. 13-CV-1806, 2013 WL 5477505, at *5 (S.D.N.Y. Oct. 2, 2013) ("The mere fact that a private actor is paid by state funds, or is hired by a state actor, is insufficient to establish state action.").

The Record bears this out, as there is no indication from any village official that they participated in or encouraged the Lawrences' lawsuit against Plaintiffs. See generally deps.

To counter this evidence, Plaintiffs point out that the Board "[e]ntered into an [e]xecutive session to discuss a possible land litigation situation" "with [a] Village Attorney" from H&H at the February 12, 2014 board meeting, the same meeting at which the Board waived any conflict of interest stemming from H&H's representation of the Lawrences. Pls.' SJ Mem. at 1

(quotations omitted). The Court sees nothing untoward, though, about a town board receiving advice from its legal counsel in private, nor is there evidence to confirm that "land litigation situation" referred to the Lawrences' suit against Plaintiffs. See generally Record. Additionally, Plaintiffs allege that H&H attorneys billed the Village for time spent working on the Lawrences' case. But Attorney Burgess' sworn affidavit explains that this billed time was for "when I reviewed the Village Code to make certain that the Village and the Lawrences did *not* have differing interests." Defs.' SJ Mot., Ex. P ¶ 12. Next, Plaintiffs point to a document the Village provided them pursuant to a November 2014 FOIL request with handwritten notes on it. The notes include "talked to Lawrences about fence in back yard – no permit required." See Am. Compl. at 12; Pls.' SJ Resp., Ex. KK-4. However, there is no information in the Record about who wrote the note or when, rendering any conclusions about it speculative at best. Plaintiffs also point to the 2016 litigation email between Parisi, Leonard, and defense counsel in the present case. See Am. Compl. at 11–12; Pls.' SJ Resp. at 15–16; Pls. SJ Mot., Ex. 24. While the Court agrees that the presence of this email in a production from the Lawrences is curious, the Lawrences brought suit nearly three years before the email was written and the email cannot support the inference that the Village was the mastermind of the Lawrences' lawsuit. See Sullivan, 526 U.S. at 52 ("[a]ction taken by private entities with the mere approval or acquiescence of the State is not state action.") (citing cases).

Thus, even if the town approved of the Lawrences' lawsuit—and there is scant evidence of that—that would be insufficient to convert the Lawrences' and H&H's behavior in the state court suit into state action. Cf. Hoai v. Vo, 935 F.2d 308, 313 n.6 (D.C. Cir. 1991) ("[L]itigation activities of private litigants and their attorneys who allegedly abused local court proceedings were not state action").

Bearing that in mind, the Court turns now to Plaintiffs' due process claims against state actors: the Village, Parisi, and Trevett. To establish a procedural due process violation, a plaintiff "must: (1) identify a property right; (2) establish that governmental action with respect to that property right amounted to a deprivation; and (3) demonstrate that the deprivation occurred without due process." Rosa R. v. Connelly, 889 F.2d 435, 438 (2d Cir. 1989), cert. denied, 496 U.S. 941 (1990).

A property right exists only where "a state or federal law confers an entitlement to benefits." Kapps v. Wing, 404 F.3d 105, 113 (2d Cir. 2005); see also Clubside, Inc. v. Valentin, 468 F.3d 144, 152 (2d Cir. 2006) ("This Circuit applies a 'clear entitlement' analysis to determine whether a [plaintiff] has a constitutionally cognizable property interest in the benefit sought."). Clear entitlement, in turn, depends "on the degree of official discretion, . . . not on the probability of its favorable exercise." RRI Realty Corp. v. Incorporated Village of Southampton, 870 F.2d 911 (2d Cir. 1989); see also Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999) ("[E]ntitlement turns on whether the issuing authority lacks discretion to deny [a zoning] permit . . . ."). The Court will consider each claim in turn.

a. Failure to Enforce

i. Municipal Defendant

By suing the Village Board in its official capacity, Plaintiffs have brought suit against the Village of Ilion itself. Lore, 670 F.3d at 164. This implicates the rules of municipal liability as establishing in Monell v. Dep't of Social Servs., 436 U.S. 658 (1978) and its progeny. To establish municipal liability, Plaintiffs must show that a constitutional violation was effected pursuant to an identified municipal policy or custom. Monell, 436 U.S. at 694–95. Here,

Plaintiffs have no valid claim against the Village because they have failed to allege a cognizable constitutional violation.

Plaintiffs have no legal entitlement to the enforcement of local zoning or traffic laws. DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 195 (1988) ("The [Due Process] Clause is . . . not . . . a guarantee of certain minimal levels of safety and security."). As a general rule, "[g]overnment officials . . . are given broad discretion whether to undertake enforcement actions." Gagliardi v. Vill. of Pawling, 18 F.3d 188, 191–92 (2d Cir. 1994); Citizens Accord, Inc. v. Town of Rochester, No. 98-CV-715, 2000 WL 504132, at *12 (N.D.N.Y. Apr. 18, 2000), aff'd, 29 F. App'x 767, 2002 WL 355929 (2d Cir. 2002). In particular, "[i]t is a long standing rule in New York that 'the decision to enforce . . . [town building and zoning] codes rests in the discretion of the public officials charged with enforcement.'" Leland v. Moran, 235 F. Supp. 2d 153, 159–62, 165 (N.D.N.Y. 2002), aff'd, 80 F. App'x 133 (2d Cir. 2003) ("[There is a settled principle in New York that, absent some constitutional mandate, public officials have discretion whether to enforce statutes.") (collecting cases). Similarly, because of the significant discretion law enforcement officials require to execute their duties, the Supreme Court has held that there is no clear entitlement to law enforcement action. See DeShaney, 489 U.S. at 195; Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748, 761 (2005) ("It is common sense that all police officers must use some discretion in deciding when and where to enforce city ordinances."). Therefore, Plaintiffs can claim no constitutionally protected property interest in the enforcement of the zoning, permitting, or traffic laws.

Plaintiffs allege that state law and Village ordinances cabined official discretion sufficiently to create a legal entitlement. Pls.' SJ Mem. at 8; Pls.' SJ Resp. at 8; see also RRI,

870 F.2d at 918 (legal entitlement exists where "the discretion of the issuing agency is so narrowly circumscribed that approval of a proper application is virtually assured"). But even so, official discretion in zoning and enforcement decisions is the rule in New York even in the face of mandatory statutory language, and for sound policy reasons. See Leland, 235 F. Supp. 2d at 165 (declining to read statute with mandatory language as imposing a "non-discretionary duty upon a village mayor to cause all violations of all laws within his or her jurisdiction to be prosecuted" because doing so would "lead to absurd results"); cf. Castle Rock, 545 U.S. at 761. Indeed, "no municipality has the resources necessary to prosecute each and every violation of the law and the executive must, therefore, exercise [her] or [his] discretion in determining how to allocate those finite resources." Leland at 166. The alternative "would improperly draw courts into becoming 'super-mayors' or 'super-prosecutors.'" Id. (citing Yale Auto Parts, Inc. v. Johnson, 758 F.2d 54, 58 (2d Cir.1985)). "Citizens of any village could commence actions in court pursuant to 42 U.S.C. § 1983 for any alleged violation of a state or local law, however trivial the violation may be, and require the court to review the citizen's complaint to ascertain whether there has been a violation of the law and, thus, whether the mayor was obligated to prosecute the violation." Leland at 166.

For these reasons, Plaintiffs have no property interest in the enforcement of town ordinances against the Lawrences, and thus cannot establish a violation of their due process rights due to Village enforcement decisions. See also Zahra v. Town of Southold, 48 F.3d 674, 681 (2d Cir. 1995) (holding that an ordinance dealing with building inspections did not create a property interest, stating that "even an outright violation of state law in the denial of a license will not necessarily provide the basis for a federal claim, at least when the applicant has a state law remedy"); Natale, 170 F.3d at 263 ("[F]ederal courts are not to be turned into zoning boards

of appeals.") (citing Village of Belle Terre v. Boraas, 416 U.S. 1, 13 (1974) (Marshall, J. dissenting).

### ii. Individual Defendants

For similar reasons, Plaintiffs due process claims against Trevett—for failing to stop the Lawrences from relocating their fence—and Parisi—for failing to adequately enforce the parking regulations—must fail.

Plaintiffs allege that Trevett "knowingly and intentionally . . . assist[ed] the Lawrences repeatedly abusively have power over our entire property since 2011." Pls.' SJ Mem. at 5. The essence of this claim is that Trevett failed to enforce various ordinances and regulations in favor of the Lawrences and in violation of Plaintiffs' due process rights. Pls.' SJ Mem. at 5–9. But in Gagliardi, the Second Circuit held that there is "[n]o due process right" to "demand that the Municipal Defendants enforce the zoning laws." 18 F.3d at 192. This was, in part, "because municipal officials retain discretion over enforcement decisions generally." Henderson v. Anderson, No. 12-CV-1716, 2014 WL 943112, at *2 (D. Conn. Mar. 11, 2014) (discussing Gagliardi). "In the wake of Gagliardi, the lower courts have found that there is no due process right to rigorous enforcement of land-use laws." Schubert v. City of Rye, 775 F. Supp. 2d 689, 704 (S.D.N.Y. 2011); see also Nemeth v. Vill. of Hancock, No. 10-CV-1161, 2011 WL 56063, at *4 (N.D.N.Y. Jan. 7, 2011) ("Simply stated, Plaintiffs have no constitutionally protected property interest in the 'benefit' of a Zoning Code violation being issued by the Defendants against [their neighbors'] use of their property."); Schwasnick v. Fields, No. 08-CV-4759, 2010 WL 2679935, at * 7 (E.D.N.Y. June 30, 2010) ("Plaintiffs are not entitled to enforce the Town Code against their neighbors."). For these reasons, Trevett's enforcement decisions regarding Ilion's zoning regulations cannot give rise to a due process claim.

Plaintiffs allege that Parisi likewise violated their due process rights by failing to enforce the parking regulations on their street and by allowing the Lawrences in install a parking lot in front of their house. Pls.' SJ Mem at 6; Pls.' SJ Resp. at 11. But Plaintiffs have no due process right to any particular enforcement outcome. The Supreme Court has held that "the Due Process Clauses generally confer no affirmative right to governmental aid" and "nothing in [their] language . . . requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." DeShaney, 489 U.S. at 195. Moreover, the law recognizes a "well established tradition of police discretion." Castle Rock, 545 U.S. at 761. "It is," the Supreme Court has proclaimed, "common sense that all police officers must use some discretion in deciding when and where to enforce city ordinances." Id. Parisi thus did not violate Plaintiffs' due process rights when setting the enforcement priorities and allocating the resources of the Ilion Police Department. See also Heckler v. Chaney, 470 U.S. 821, 831 (1985) ([A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion.").

### b. Conflict of Interest

Plaintiffs argue that their due process rights were violated because the "Lawrences (daycare owners/code violators) were also being represented by the Village Attorney." Pls.' SJ Mem. at 2. According to Plaintiffs, this created a "conflict of interest," because H&H was representing the Lawrences in their civil suit against Plaintiffs. Id. at 3. Thus "when the Village board gave consent [to] "No Conflict," [and] maintained that consent, [it] interfered with our Due Process." Id.; see also Pls.' SJ Mot., Ex. 35 (minutes of the February 12, 2014 Board meeting at which the Board gave informed consent to H&H's representation of the Lawrences). Plaintiffs therefore appear to advance a novel legal theory: that a government body can violate a

citizens due process rights by exercising its discretion to waive a potential conflict of interest in its lawyer's representation of another citizen.

The Court can find no legal authority to support this theory, and the authority Plaintiffs cite is inapposite, as none of those cases considered alleged deprivations of due process brought under § 1983. See Pls.' SJ Mem at 3 (citing Stanford v. Griffin, No. 16-CV-1160, 2018 WL 1756141, at *5 (N.D.N.Y. Apr. 10, 2018); Heyliger v. Collins, No. 11-CV-1293, 2014 WL 910324, at *4–5 (N.D.N.Y. Mar. 10, 2014); Kuris v. Kuris, 23 Misc. 3d 1119(A), 886 N.Y.S.2d 71 (Sup. Ct. 2009). Heyliger and Kuris concern motions to disqualify conflicted counsel, not an ex post claim that because counsel was not disqualified, a litigant's due process rights were violated. In fact, those cases' procedural posture demonstrates why a due process violation due to a conflict of interest must be so rare: in the majority of cases, there are adequate state-law procedural protections in place to prevent the alleged deprivation. See Mathews v. Eldridge, 424 U.S. 319, 335 (1976). In the state court suit, Plaintiffs were represented by counsel and knew about the alleged conflict of interest during the pendency of the litigation. Pls.' SJ Resp., Ex. CC-6. Thus, they had pre- and post- deprivation remedies available to them. If their motion to disqualify was denied by the Herkimer County Supreme Court, this Court has no power to review that decision. See Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923); District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983). Under the circumstances, an after-the-fact § 1983 suit for damages is not the appropriate remedy.

### c. The State Court Suit

Plaintiffs allege that the state court suit brought against them by the Lawrences also violated their due process rights. Pls' SJ Resp. at 9–10. They state that the two TROs issued by the Herkimer County Supreme Court in January 2014 "were perfumed [sic] under ex parte, both

times. Plaintiffs were denied the right to be heard . . . no opportunity to defend ourselves." Id. at 19. They argue that "this was an outrageous abuse of procedural Due Process." Id. at 10. However, ex parte TROs do not violate due process so long as there is sufficient post-deprivation notice and an opportunity to be heard. See, e.g., Fed. R. Civ. P. 65; see also Mitchell v. W. T. Grant Co., 416 U.S. 600 (1974) (ex parte pre-judgment attachment procedure does not violate due process). In the case of the New York TRO statute, C.P.L.R. 6301, there are adequate post-issuance remedies, and the statute has been applied repeatedly in federal courts without constitutional question. See, e.g., Dosiak v. Town of Brookhaven, No. 16-CV-6658, 2017 WL 7048912, at *14 (E.D.N.Y. Nov. 27, 2017). Hence, there was no violation of Plaintiffs' due process rights when the Herkimer County Supreme Court issued the TROs in 2014. What's more, if somehow the TROs had violated Plaintiffs' due process rights, it would have been "the court, not the [opposing litigants], that [did so by] fail[ing] to provide [the necessary] hearing[,] and a remedy for such an omission exists in the form of an Article 78 proceeding which provides relief . . . through a writ of mandamus." Id.; see also Rankel v. Town of Somers, 999 F. Supp. 2d 527, 546 (S.D.N.Y. 2014) ("[I]t is well established that Article 78 proceedings, which Plaintiff could have pursued, satisfy due process requirements.") (citing Hellenic Am. Neighborhood Action Comm. v. City of N.Y., 101 F.3d 877, 881–82 (2d Cir. 1996).

Finally, if the Lawrences' lawsuit could somehow be attributed to Defendants, Plaintiffs' proper claim would be a due process violation for malicious prosecution. But because Plaintiffs "were never taken into custody, imprisoned, physically detained or seized within the traditional meaning of the Fourth Amendment," any § 1983 claim arising out of that alleged "malicious prosecution" would fail. Washington v. Cty. of Rockland, 373 F.3d 310, 316 (2d Cir. 2004).

d.  Failure to Train

Plaintiffs allege that the Village failed to train its employees and, in failing so, violated their due process. Pls.' SJ Mem. at 5. Specifically, they allege inadequate training for: (1) Trevett in enforcing state and city regulations, id. at 11–12; (2) the "Village Clerk(s)" who "mishandled" Plaintiffs' FOIL requests, Pls.' SJ Facts at 4; (3) and Village police officers who did not report child welfare issues, id. Under Monell, a municipality can be liable for failing to train its officials and employees when that failure "amounts to deliberate indifference to the rights of persons with whom the [officials] come into contact." Anthony v. City of New York, 339 F.3d 129, 140 (2d Cir. 2003) (citing City of Canton v. Harris, 489 U.S. 378, 388–89 (1989)). However, liability attaches only where the "underlying action of [the municipality's] officers" was unconstitutional. Smith v. Town of E. Haven, No. 01-CV-1375, 2005 WL 677284, at *7 (D. Conn. Mar. 22, 2005). As described above, the Court has already decided that Trevett's enforcement decisions did not violate Plaintiffs' constitutional due process rights. Additionally, the statutory rights guaranteed by New York's FOIL provisions are not constitutional, and thus their violation cannot serve as a predicate for Monell liability. See Putnam Pit, Inc. v. City of Cookeville, Tenn., 221 F.3d 834, 840 (6th Cir. 2000) ("[T]he First Amendment . . . does not provide blanket access to information within the government's control."); Nicholson v. Scoppetta, 344 F.3d 154, 166–67 (2d Cir. 2003) (requiring the deprivation of a constitutional right for municipal liability under Monell). And as for Plaintiffs' claims regarding Village police officers, these claims are wholly conclusory, as Plaintiffs have submitted no evidence about police training at all. Hence, Plaintiffs' failure-to-train claim must fail.

### e. Taking

Plaintiffs have also alleged a vague "taking" of their property. The gist of this claim is that by failing to prevent the erection of the fence, the Village "render[ed] [Plaintiffs'] entire property over to the day care." Am. Compl. at 7. However, in order to establish a regulatory taking, a plaintiff is "required to show that the regulation had an economic impact that interfered with distinct investment-backed expectations," <u>Cablevision Sys. Corp. v. F.C.C.</u>, 570 F.3d 83, 98–99 (2d Cir. 2009), and that the "injuries [are] so severe that compensation is required," <u>Nat'l Fuel Gas Distribution Corp. v. N.Y. State Energy Research & Dev. Auth.</u>, 265 F. Supp. 3d 286, 292 (W.D.N.Y. 2017). But because Plaintiffs admit that the fence had no effect on the value of their property, Macera Dep. at 42, they would have no claim even were they able to surmount the formidable obstacles imposed by the state action requirement in this case.

### f. Accessibility of ZBA Hearings

Plaintiffs allege that the Defendants violated their due process rights "by preventing . . . Plaintiffs' access to [the] ZBA" meeting where the Lawrences' day care permits were issued. Pls.' SJ Resp. at 5. But this claim too must fail. The Record confirms that both the January 23, 2012 meeting where the ZBA considered the Lawrences' first permit application and the July 17, 2014 meeting at which the ZBA considered their application for their new location were publicized in the local paper and open to the public. Pls.' SJ Resp., Ex. KK-2, Pls.' SJ Mot., Ex. 51. Therefore, Plaintiffs were not denied access to the meetings or prevented from attending. There is no due process violation simply because Plaintiffs did not receive a personal invitation.

### 3. *First Amendment Retaliation*

To prove a First Amendment retaliation claim a plaintiff must show: "(1) [s]he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially

caused by [her] exercise of that right; and (3) the defendant's actions caused [her] some injury." Dorsett v. County of Nassau, 732 F.3d 157, 160 (2d Cir. 2013) (per curiam) (citing Curley v. Village of Suffern, 268 F.3d 65, 73 (2d Cir. 2001)). The injury can take the form of actually chilled speech, see Oliveras v. Saranac Lake Cent. Sch. Dist., No. 11-CV-1110, 2014 WL 1311811, at *21 (N.D.N.Y. Mar. 31, 2014) ("[T]he conduct [must] actually chill[] the exercise of [First Amendment] rights."), or "other forms of harm . . . ," Zherka v. Amicone, 634 F.3d 642, 645 (2d Cir. 2011); see, e.g., Gagliardi, 18 F.3d at 190 (declining to dismiss First Amendment retaliation claim where plaintiffs adequately pleaded non-speech injuries such as noise pollution).

In this case, Defendants concede that Plaintiffs "have engaged in conduct protected by the First Amendment, which satisfies the first element." Defs.' SJ Mem. at 15. Plaintiffs have also submitted evidence—that Defendants have not disputed—of injuries such as property damage from illegally-parked cars, harassment, reputational damage, and smoke inhalation, among others. See generally Record. The inquiry thus turns on the intent element.

"The ultimate question of retaliation [in the First Amendment context] involves a defendant's motive and intent . . . ." Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 91 (2d Cir. 2002). To establish a First Amendment retaliation claim, the plaintiffs must show that the defendants acted "with the purpose of deterring the exercise of First Amendment freedoms." Greenwich Citizens Comm., Inc. v. Counties of Warren & Washington Indus. Dev. Agency, 77 F.3d 26, 31 (2d Cir. 1996). This requires "[s]pecific proof of improper motivation . . . in order for [a] plaintiff to survive summary judgment on a First Amendment retaliation claim." Curley, 268 F.3d at 73 (citing Blue v. Koren, 72 F.3d 1075, 1082–83 (2d Cir. 1995) (requiring plaintiff to provide "specific allegations or direct evidence of the required state

34

of mind in order to avoid summary judgment based on the defense of qualified immunity")). Specifically, "the plaintiff must proffer particularized evidence of direct or circumstantial facts . . . supporting the claim of an improper motive in order to avoid summary judgment." Hogan v. City of New York, No. 04-CV-3298, 2007 WL 9710294, at *11 (E.D.N.Y. Mar. 12, 2007).

As described below, the Court finds that Plaintiffs have failed to raise a genuine dispute as to whether Parisi acted with retaliatory animus, and therefore summary judgment is warranted for the claims against Parisi. As for Trevett and the Village, the Court finds that there is a disputed issue of material fact as to those Defendants' intent during June and July 2016, when they apparently failed to respond to Plaintiffs' complaints about Lyman demolishing a structure on his property, burning construction materials, and harassing Plaintiffs. As to all other issues, including the 2013 fence incident, the failure to train, and the availability of Village codes on the website, the Court finds that Plaintiffs have failed to raise an issue of material fact as to Defendants' motives and Defendants are entitled to judgment as a matter of law on these issues.

### a. Parisi

Plaintiffs' First Amendment claim against Parisi arises out of his alleged failure to have the Ilion police department enforce the Village parking regulations on English Street.

As an initial matter, Plaintiffs' complaints against Parisi are confined to the period before July 2014, when the Lawrences moved their day care from 14 English Street to a new location. Subsequent to that, in particular since 14 English Street stood vacant for a number of months afterwards, the parking problem presumably abated. Parisi appears to have no role in Plaintiffs' disputes with the Village Board over FOIL requests and meeting procedure, nor does the Record show him copied on any of the June and July 2016 communications. Since Parisi was not personally involved in those later incidents, he cannot be liable for any alleged constitutional

violations from that time period. See Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.").

As regards the events prior to July 2014, Plaintiffs have failed to meet their burden on the improper motive prong of this First Amendment retaliation claim. Evidence of improper motive "may include expressions by the officials involved regarding their state of mind, circumstances suggesting in a substantial fashion that the plaintiff has been singled out, or the highly unusual nature of the actions taken." Blue, 72 F.3d at 1084.

Plaintiffs' evidence demonstrates no direct evidence of improper motive and little circumstantial evidence of retaliatory intent. A review of the Record reveals that Plaintiffs first contacted Parisi about their parking issues at the end of July 2013. Pls.' SJ Mot., Ex. 15 at 1. But Plaintiffs' concerns about parking began long before July 2013, see Macera Dep. at 51–53; Pls.' SJ Mot., Ex. C, during a period in which they had no interaction with Parisi. This belies that argument that a lack of enforcement was due to any retaliatory animus. Moreover, after the July 2013 email, Parisi and Plaintiffs exchanged cordial emails over the following months, culminating in a March 2014 email in which Plaintiffs thanked Parisi for "patrol[ling] for violations" and noted that a ticket had been issued a few days before. Pls.' SJ Mot., Ex. 15 at 17. This body of evidence reveals Parisi to be, on the whole, a responsive public servant. See, e.g., Pls.' SJ Mot., Ex. 15 at 14 (investigating Plaintiffs' complaint regarding an officer who had failed to ticket a purportedly illegally parked car).

Additionally, Ms. Macera testified at her deposition that she and her husband had called the Ilion police department "about eight times" from 2008 to 2013, Macera Dep. at 52, but the first call by Plaintiffs documented in the Record dates only to June 19, 2013, well after Plaintiffs

issues with parking began, see Macera Dep. at 51–53; Pls.' SJ Mot., Ex. C. Further, Police

records confirm that Ilion Police Officers responded to these calls. Defs.' SJ Mot., Ex. Q.

Though Plaintiffs may have been dissatisfied with officers' decisions not to issue tickets as a

result of many of these calls—especially in light of the number of purported violations occurring

on their street, Pls.' SJ Mot., Ex. 12 (110 photos purportedly documenting parking violations on

English Street)— "the First Amendment guarantees the people's right to petition their

government: not to petition successfully." Reardon v. Keating, 980 F. Supp. 2d 302, 313 (D.

Conn. 2013).

Moreover, the tradition of police discretion in enforcing the law is well established. See

City of Chi. v. Morales, 527 U.S. 41, 62 n.32 (1999) (noting that "all police officers must use

some discretion in deciding when and where to enforce city ordinances"). In light of this

discretion, the Court cannot say the enforcement record on Plaintiffs' street is "unusual" enough

to demonstrate retaliatory intent. Cf. Leland, 235 F. Supp. 2d at 166 ("[N]o municipality has the

resources necessary to prosecute each and every violation of the law and the executive must,

therefore, exercise his or her discretion in determining how to allocate those finite resources.").

Overall, the Record fails to raise genuine dispute of material fact that Parisi—or anyone

at the Ilion Police Department—harbored retaliatory intent against Plaintiffs. See also, Pls.' SJ

Mot., Ex. 34 at 4–7 (documenting police follow-up to an August 2016 complaint that Plaintiffs

felt threatened by the Lawrences). "While Plaintiffs undoubtedly had a constitutionally protected

right to complain to [city officials] about the situation surrounding their property, the right to

petition the government does not include a right to require certain government action, or convert

a government entity's determination not to act into a prima facie case of First Amendment

retaliation." Schubert, 775 F. Supp. 2d at 705. Here, where there is no evidence that Parisi

"singled out" Plaintiffs or that his actions were "highly unusual," no reasonable jury could find that Parisi harbored a retaliatory motive. See Anderson v. Perales, No. 91-CV-1294, 2006 WL 1555605, at *12 (N.D.N.Y. June 6, 2006) (granting summary judgment for defendants where "plaintiff submit[ed] little evidence that defendants made any inappropriate statements or remarks that could reveal an improper motive or conspiracy, that they inappropriately singled him out, or they took any unusual actions at all during the course of [an] investigation"). Therefore, the Court dismisses all claims against Parisi.

### b. Trevett

#### i. The 2009-2014 Events

Plaintiffs allege that Trevett retaliated against them by failing to enforce a variety of village ordinances against the Lawrences, including the zoning codes and the fire codes, from the time the Lawrences moved to 14 English Street in 2009 to 2014 when they moved out. See Compl. ¶ 16–18; Pls.' SJ Mem. at 5–10. As with Parisi, Plaintiffs have failed to meet their burden of proving improper motive with evidence of "expressions by . . . officials involved regarding their state of mind, circumstances suggesting in a substantial fashion that the plaintiff has been singled out, or the highly unusual nature of the actions taken." Blue, 72 F.3d at 1084

Plaintiffs allege in their Complaint that they had contacted Trevett prior to June 2013. Compl. ¶ 16. But the Record indicates that they first learned he was the Code Enforcement Officer on June 26, 2013, Dkt. No. 16 at 76, and that Plaintiffs first contacted him only after that, Dkt. No. 113-3 ("Plaintiffs' SJ Affidavit"); see also Dkt. No. 59 at 1 (same). Plaintiffs confirm this when they state in their Response that "Defendant Trevett [never] followed through on the Plaintiffs grievance *as presented to Mayor Stephens* (Mayor in 2011-2012 term)," indicating that they did not speak with Trevett himself. Pls.' SJ Resp. at 4 (emphasis added). Additionally, the

letter Plaintiffs sent Trevett about the Lawrences' fence plans on June 27, 2013 states that

Trevett had already granted permission to the Lawrences to erect the fence. Pls'. SJ Mot., Ex. 46

("It has come to my attention that you have granted permission to 14 English St. to place a fence

on our common property line."). To the extent this letter indicates that Trevett had already

reviewed the Lawrences' plans and determined they did not need a permit, it indicates that he did

so *prior* to Plaintiffs' complaint to him. He cannot therefore be said to have retaliated against

Plaintiffs in his permitting decision.

 The same is true for Trevett's alleged failure to prevent the permitless paving of the

Lawrences front yard in June 2013. Pls.' SJ Mot. at 6, 9. With the evidence indicating that

Plaintiffs first complained to Trevett on June 27, 2013, after the Lawrences had already

constructed the parking lot on or about June 22, 2013, Macera Dep. at 48, Plaintiffs have

propounded no reason why Trevett might have been motivated to retaliate against them by

declining to require the Lawrences to obtain a permit to relocate their fence. See Shaheen v.

Filion, No. 04-CV-625, 2006 WL 2792739, at *3 (N.D.N.Y. Sept. 17, 2006) (granting summary

judgment for defendant on First Amendment retaliation claim for lack of causal connection

where no evidence that defendant was aware of plaintiff's protected activity at time of allegedly

retaliatory conduct); Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals, 812 F. Supp.

2d 357, 372 (S.D.N.Y. 2011) ("[I]n the absence of evidence that [a defendant official] was aware

of Plaintiff's state court proceeding, he cannot be said to have retaliated against Plaintiff because

of that proceeding.").

 Overall, Plaintiffs allege that Trevett's failure to perform mandatory annual fire

inspections dates back to 2009 when the Lawrences opened their day care. But Plaintiffs first

raised their concerns to any town official, then-Mayor Stevens, in 2011, two years after the day

care opened. Macera Dep. at 24–25. Trevett's alleged failure to inspect the daycare then cannot be said to be a retaliatory response to Plaintiffs' protected First Amendment activity of voicing concerns to government officials.

By contrast, the Record confirms that when Trevett received Plaintiffs' June 2013 letter about the Lawrences' fence, he responded within a few weeks with both a phone call and a letter.[6] "Pls'. SJ Mot., Ex. 46 at 4. Trevett made clear in his letter that the Village "do[es] not take sides and . . . cannot enforce deed restrictions," and advised Plaintiffs to take up their "civil matter[]" in "a court of law." Moreover, Plaintiffs' ongoing exchanges with Trevett throughout the summer of 2013 likewise display no indication of retaliatory animus. See, e.g., Dkt. No. 123-5 ("Pls.' SJ Resp., Ex. KK 1") at 12–19 (letter from Trevett to Plaintiffs providing Village zoning codes). Plaintiffs recognized this at the time, noting that it was "very refreshing to [see] such professionalism." Id. at 13.

In his deposition, Trevett stated that he did not compel the Lawrences to obtain a permit to relocate the fence because he did not think a relocation required a permit. Trevett Dep. at 19. And when asked why he "didn't enforce any laws" against the Lawrences, Trevett maintained that he had no relationship with either the Lawrences or Plaintiffs. Id. at 165. Though the Court need not credit this testimony from an interested witness on summary judgment, Williams v. City of White Plains, 718 F. Supp. 2d 374, 377 (S.D.N.Y. 2010), Plaintiffs have produced no evidence to cast these statements into doubt.[7]

---

[6] Trevett stated that his delay in responding was due to flooding in the Village, Pls'. SJ Mot., Ex. 46 at 4, flooding that Plaintiffs acknowledge occurred, Compl. ¶ 4.

[7] Plaintiffs also allege Trevett failed to perform mandatory annual fire inspections of the Lawrences' day care. Pls.' SJ Mem. at 8. Unfortunately, since Ilion apparently kept no records of these inspections prior to 2016, Pls.' SJ Resp., Ex. JJ, there is no evidence to support or disprove this allegation.

Plaintiffs argue that by "cho[osing] to allow the fence to be relocated, [Trevett] picked a side," Pls.' SMF Resp. ¶ 16, but the Court fails to see how Plaintiffs' proposed alternative—that Trevett should have "issued[d] a cease and desist order" preventing the Lawrences from constructing the fence—is more "neutral" in a property dispute between neighbors, Am. Compl. at 6. To the contrary, it appears reasonable, not retaliatory, for Trevett to stay out of a potential legal dispute between neighbors and advise Plaintiffs to take up their "civil matters . . . in a court of law." Id. at 4; see also Holmes v. Poskanzer, No. 08–CV–14750, 2009 WL 2171326, at *2 (2d Cir. Jul. 21, 2009) ("Regardless of any retaliatory motive, the plaintiff cannot prevail if a defendant can show he or she would have taken the same action even in the absence of the allegedly improper reason.").

If Plaintiffs are correct that Trevett potentially misinterpreted or misapplied certain municipal ordinances, his conduct perhaps raises questions of negligence. But a First Amendment claim in this context requires intentional retaliation. The Court finds that Plaintiffs have failed to raise a genuine issue of material fact as to whether Trevett possessed retaliatory intent when applying the municipal codes to the Lawrences' 14 English Street home. See Schubert, 775 F. Supp. 2d at 713 ("[N]o reading of Gagliardi suggests that a disgruntled plaintiff has a viable retaliation claim merely because a government official declines to remedy every wrong identified by that plaintiff.").

*ii. The 2016 Events*

However, the Court finds that Plaintiffs have raised a genuine issue of material fact as to Trevett's intent with regards to their complaints about their neighbor Lyman in 2016. On June 1, 2016, Plaintiffs complained to the Ilion Fire Department that their neighbor at 16 English Street was burning noxious construction materials in his back yard, Pls.' SJ Mot., Ex. 22, and on June

2, 2016 they complained to Trevett's boss, the mayor. Dkt. No. 16-1 at 52–59. Trevett did eventually send the neighbor a letter and order him to stop, but only on June 20, 2016, almost three weeks later. Defendants point to Trevett's actions as evidence that he harbored no retaliatory animus toward Plaintiffs, Defs.' SJ Mem. at 16, but make no effort to explain the lengthy delay before the fire chief responded to a report of illegal burning. There may, of course, be an innocent explanation for Trevett's three-week delay in responding to this complaint, but if so, Defendants failed to provide it. Instead, Defendants point to Trevett's response to two more of Plaintiffs' 2016 complaints—relayed to him again through his supervisor, the Mayor—as additional evidence that Trevett did not retaliate against Plaintiffs. 123-4 ("Pls.' SJ Resp., Ex. II") at 3–4 (describing how, in January 2016, Trevett took action on two of Plaintiffs' complaints). This evidence may be probative of a lack of retaliatory intent, but it is not dispositive. In the face of conflicting evidence like this, the Court finds that Plaintiffs have raised a genuine issue of material fact on this issue.

The Court notes as well that, by June 2016, Plaintiffs had submitted at least seven FOIL requests regarding Trevett's record and behavior as fire chief and code enforcement officer, see generally Pls.' SJ Resp., Exs. KK-1 to -20, and had submitted a letter of intent to the Village Board about their intent to sue over numerous alleged code violations, Pls.' SJ Mot., Ex. 3. This is undoubtedly First Amendment activity. See, e.g., Wallace v. Fisher, No. 9:13-CV-1208, 2015 WL 64533, at *5 (N.D.N.Y. Jan. 5, 2015) ("[F]iling a lawsuit pursuant to 42 U.S.C. § 1983 [is] in constitutionally-protected conduct"). Similarly, being subjected to noxious smoke from the nearby burning of construction materials satisfies the injury requirement of a First Amendment retaliation claim. Cf. Gagliardi, 18 F.3d at 190 (noise pollution sufficient non-speech injury to

sustain First Amendment retaliation claim). Therefore, Plaintiffs have raised an issue of material fact as to all three elements of a First Amendment retaliation claim.

### iii. Qualified Immunity

Defendants argue that Trevett is protected by qualified immunity. Defs.' SJ Mem. at 17–20. The Court disagrees.

Qualified immunity protects government officials from liability for civil damages so long as their conduct does not "violate clearly-established rights of which an objectively reasonable official would have known." Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999); accord Tracy, 623 F.3d at 95–96. The qualified immunity inquiry therefore proceeds in two parts: first, whether a statutory or constitutional right was violated when the evidence is "viewed in the light most favorable to the plaintiff," and whether that statutory or constitutional right "was clearly established at the time of the alleged violation." Tracy, 623 F.3d at 96. "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 815 (2009) (internal quotation marks omitted). Additionally, defendants bear the burden of establishing qualified immunity. Vincent v. Yelich, 718 F.3d 157, 166 (2d Cir. 2013).

A constitutional right is "clearly established" when "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Mollica v. Volker, 229 F.3d 366, 370 (2d Cir. 2000) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).[8] The Second Circuit has found three factors relevant to this inquiry: (1)

---

[8] While this is the second prong of the qualified immunity analysis, the Supreme Court has relaxed the rigid ordering prescribed by Saucier v. Katz, 533 U.S. 194 (2001), and stated that

the right in question should be defined with "reasonable specificity," (2) Supreme Court and Second Circuit decisions support the existence of the right in question, and (3) a reasonable defendant would understand that their conduct is unlawful under existing law. Id. at 371 (quoting Shechter v. Comptroller of the City of New York, 79 F.3d 265, 271 (2d Cir. 1996)). While the Supreme Court's case law "do[es] not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." White v. Pauly, 137 S. Ct. 548, 551 (2017) (quotations omitted).

"The unlawfulness of retaliating against a person for the exercise of First Amendment rights is apparent." Dorsett-Felicelli, Inc. v. Cty. of Clinton, 371 F. Supp. 2d 183, 193 (N.D.N.Y. 2005) (Kahn, J.) (citing Dobosz v. Walsh, 892 F.2d 1135, 1141 (2d Cir. 1989) ("[T]he proscription of retaliation for a plaintiff's exercise of First Amendment rights has long been established . . . .")); see also Frisenda v. Inc. Vill. of Malverne, 775 F. Supp. 2d 486, 522–23 (E.D.N.Y. 2011) ("[Plaintiff's right under the First Amendment to be free from retaliation . . . is clearly established."). Therefore, the Court asks whether it was "objectively reasonable for [Trevett] to believe that [he was] not committing [First Amendment] violations." Id. at 513. However, the fact or retaliation alone "is independently sufficient to preclude the Court from determining as matter of law that [an] individual defendant['s] actions were objectively reasonable." Dobosz, 892 F.2d at 1141–42. "In other words, if the individual defendant[] did in fact intentionally retaliate against [P]laintiffs because of their First Amendment activity, [he] would not be protected by qualified immunity." Id.; see also Mandell v. County of Suffolk, 316

---

district courts have discretion to consider either element of the qualified immunity claim first. Pearson, 555 U.S. at 236.

F.3d at 385 (where there were "there were disputed issues of fact on the issue of intent that precluded summary judgment on a First Amendment retaliation claim, qualified immunity was also unwarranted"). Therefore, Trevett is not protected by qualified immunity as to Plaintiffs' First Amendment retaliation claim.

### iv. Mootness

Because the Court has determined that Plaintiffs have a live First Amendment retaliation claim, it must now consider Defendants' mootness argument. Defendants argue that Plaintiffs' claims are moot because they are "based on allegations that the Lawrences erected a fence in June/July 2013 that violated their deed" and "in or about March/April 2015 . . . the fence at issue [was] removed." Defs.' SJ Mem. at 8–10. But this misstates or misunderstands Plaintiffs' claims. Plaintiffs' claim for damages is based on the alleged retaliatory violation of their First Amendment rights by government officials, a violation that arose out of their complaint that the erection of the fence violated their property and due process rights. See Compl. ¶¶ 30–31; Pls.' SJ Resp. at 5, 20. As the rights are distinct, so are the claims. And as Plaintiffs' claims seek relief for injury that occurred in the past, rather than redress of potential future wrongs, their claims are not moot. See CMR D.N. Corp. v. City of Philadelphia, 703 F.3d 612, 622 (3d Cir. 2013) ("Claims for damages are retrospective in nature—they compensate for past harm. By definition, then, such claims cannot be moot.") (quotations omitted).

Therefore, the parties' motions for summary judgment on the issue of Trevett's response to Plaintiffs' June 2016 complaint is denied

### c. Municipal Defendant

Municipalities are responsible only for "their own illegal acts," Pembaur v. Cincinnati, 475 U.S. 469, 479 (1986), and are not vicariously liable for civil-rights violations perpetrated by

their employees, see Monell, 436 U.S. at 691. To establish municipal liability for First Amendment retaliation, Plaintiffs must show that they were retaliated against pursuant to an identified municipal policy or custom. Monell, 436 U.S. at 694–95. A municipal policy or custom exists where the facts show: (1) a formal policy, officially promulgated by the municipality, id. at 690; (2) action taken by the official responsible for establishing policy with respect to a particular issue, Pembaur, 475 U.S. at 483–84; (3) an unlawful practice by subordinate officials so permanent and widespread as to practically have the force of law, City of St. Louis v. Praprotnik, 485 U.S. 112, 127–30 (1985); or (4) a failure to train or supervise that amounts to "deliberate indifference" to the rights of those with whom the municipality's employees interact, City of Canton, 489 U.S. at 388.

At the outset, the Village cannot be liable for conduct that the Court has already determined was not a constitutional violation, such as setting enforcement priorities for Village police or applying the local zoning code to the Lawrences' fence. See Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006) (observing that there must be an underlying constitutional violation to support a Monell claim); Rutigliano v. City of New York, 326 F. App'x 5, 9 (2d Cir. 2009) (affirming summary judgment dismissal of the plaintiff's Monell claim where the court dismissed all of the plaintiff's section 1983 claims).

### i.  Failure to Enforce

Plaintiffs have established a triable issue of material fact as to whether the Village in 2016 had a policy or custom of ignoring Plaintiffs' complaints in retaliation for the exercise of their First Amendment rights.[9] This is because they have provided sufficient evidence that the

---

[9] Defendants argue that "CEO Trevett and Chief Parisi and by extension the Village, are protected by qualified immunity." Defs.' SJ Mem. at 18. But this misunderstands the qualified immunity doctrine, which protects only individual defendants, not municipal entities. White

Ilion Mayor—a final policymaker—ignored their serious complaints at the same time that their dispute with the town blossomed into litigation.

The Second Circuit has held that a plaintiff may demonstrate municipal liability by showing that a municipal "policymaker" violated plaintiff's constitutional rights. Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 126 (2d Cir. 2004); see also Gronowski v. Spencer, 424 F.3d 285, 296 (2d Cir. 2005) ("Municipal liability may attach under § 1983 when a [municipal] policymaker takes action that violates an individual's constitutional rights."); Davis v. Lynbrook Police Dep't, 224 F. Supp. 2d 463, 478 (E.D.N.Y. 2002) ("A plaintiff can show a municipal custom, policy or practice by establishing that an official who is a final policymaker directly committed or commanded the constitutional violation . . . ."). "Whether the official in question possessed final policymaking authority is a legal question, which is to be answered on the basis of state law." Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000), cert. denied, 531 U.S. 813 (2000) (quotation marks and citations omitted); Manemeit v. The Town Of Branford, No. 04-CV-1353, 2009 WL 1743749, at *4 (D. Conn. June 18, 2009) ("[O]nly those municipal officials who have 'final policymaking authority' (a question of state law) may by their actions subject the government to § 1983 liability.") (quoting Praprotnik, 485 U.S. at 123).

The Mayor of Ilion is a final policymaking authority. The Mayor is a full voting member of the board of trustees, which has the power and duty to "make, publish, amend and repeal regulations" and "to carry into effect the provisions of [the Village charter] and of other laws." See Pls.' SJ Mot., Ex. 3, § C-15. Additionally, the mayor is especially invested with the "duty to

<hr/>

River Amusement Pub, Inc. v. Town of Hartford, 412 F. Supp. 2d 416, 429 n.6 (D. Vt. 2005), aff'd, 481 F.3d 163 (2d Cir. 2007) ("Municipalities do not enjoy either absolute or qualified immunity from suit under Section 1983.") (citing Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 166 (1993)).

receive complaint of" violations of law and to see that the Village rules and regulations are "faithfully executed and observed." Id. at § C-20. These provisions empower the mayor to set enforcement policies for Village departments. Because these provisions empower the mayor to set enforcement policies for Village departments, and because Defendants have provided no briefing on this issue, Plaintiffs' submission of the Village code is sufficient as this stage to show that the Mayor "is a final policymaker with respect to the particular conduct challenged in the lawsuit," namely responding to Plaintiffs' June 2016 complaints of violations of particular local laws. See Roe v. City of Waterbury, 542 F.3d 31, 37 (2d Cir. 2008).

The Record establishes that Plaintiffs complained to the Mayor about the activities of their neighbor at 16 English Street, including burning construction materials outside his house. After an initial letter on March 16, 2016, Plaintiffs sent a succession of emails to the mayor on June 2, 2016, June 20, 2016, June 24, 2016, and July 7, 2016. Dkt. No. 16-1 at 52–59; Dkt. No. 16-2 at 106–09. Though the mayor did take action after the June 2 email—forwarding it to Trevett—in light of Plaintiffs subsequent complaints, this apparently failed to ameliorate the problem. Because "[e]ven one episode of illegal retaliation may establish municipal liability under § 1983" if that episode results from acts or omissions by "a person whose edicts or acts represent official city policy," Gronowski, 424 F.3d at 296; see also Amnesty, 361 F.3d at 126, Plaintiffs claim against the Village can succeed if they have provided sufficient evidence to establish a genuine dispute as to the Mayor's retaliatory animus. The Court finds that Plaintiffs' have.

By June 2016, Plaintiffs' relationship with Village officials had grown contentious, as evidenced by most clearly by the aggressive email exchanges surrounding Plaintiffs' FOIL requests, see Pls.' SJ Resp., Ex. KK, Plaintiffs' 2015 letter of intent to file a lawsuit against the

Village, Pls.' SJ Mot., Ex. 3, and, finally, in the midst of the dispute about Lyman, filing this lawsuit on June 14, 2016. While Plaintiffs' June 2 email—the only email which the Record shows Leonard responding to—predates the filing of this suit, the other June and July emails were sent subsequent to it, and those complaints all apparently went unaddressed. Such timing can serve as evidence of retaliatory intent. See Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009) ("A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action."). It is possible Leonard took action in response to Plaintiffs' complaints; it is also possible she did nothing, but there is an innocent reason why. However, because Defendants have failed to address or explain these events in their briefing, the Court cannot conclude she acted without retaliatory animus. Therefore, Plaintiffs have successfully raised an issue of material fact as to whether the Village—through the Mayor—acted with retaliatory animus in ignoring Plaintiffs' 2016 complaints. Because Defendants have conceded that Plaintiffs engaged in protected First Amendment activity, and Plaintiffs have submitted evidence of tangible injury, including the inhalation of smoke fumes, summary judgment on this issue must be denied.[10] [11]

The absence of this temporal proximity is why Plaintiffs' other failure-to-enforce claims of retaliation fail. Plaintiffs complained about their neighbors to then-Mayor Stephens in 2011, Macera Dep. at 24–25, but this was two years after the Lawrences began operating their allegedly unlicensed daycare and Plaintiffs' problems with parking began, see id. at 19–20. This

---

[10] Because the Court has determined that Plaintiffs' First Amendment retaliation claim against the Village can proceed on this basis, for the sake of judicial economy, the Court will not consider whether Trevett himself is a final policymaker subjecting the Village to liability.

[11] For the same reasons as described above in the section on Trevett, Plaintiffs' claim against the Village is not moot.

belies any claim that regulations were not enforced against the Lawrences in retaliation for Plaintiffs' complaints. Further, while the alleged failure to enforce town regulations during the 2013 fence incident came after Plaintiffs' complaint to Mayor Stephens, "district courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse . . . action does not allow for an inference of causation." Williams v. Woodhull Med. & Mental Health Ctr., No. 10-CV-1429, 2012 WL 555313, at *2 (E.D.N.Y. Jan. 31, 2012), report and recommendation adopted sub nom. Williams v. Woohdull Med. & Mental Health Ctr., No. 10-CV-1429, 2012 WL 567028 (E.D.N.Y. Feb. 21, 2012). Plaintiffs' did complain to the mayor again in January 2015, but by that time Leonard had replaced Mayor Stephens and the Lawrences had moved out of the 14 English Street house, see Pls.' SJ Resp., Ex. KK-6, again undermining a claim of retaliatory intent.

### ii. Failure to Train

Plaintiffs allege that the Village failed to train its employees and, in failing so, violated their due process. Pls.' SJ Mem. at 5. Specifically, they allege inadequate training for: (1) Trevett in enforcing state and city regulations, id. at 11–12; (2) the "Village Clerk(s)" who "mishandled" Plaintiffs' FOIL requests, Pls.' SMF at 4; and (3) Village police officers who did not report child welfare issues, id. Under Monell, a municipality can be liable for failing to train its officials and employees when that failure "amounts to deliberate indifference to the rights of persons with whom the [officials] come into contact." Anthony, 339 F.3d at 140 (citing City of Canton, 489 U.S. at 388–89). However, liability attaches only where the "underlying action of [the municipality's] officers" was unconstitutional. Smith, 2005 WL 677284, at *7. With regard to Trevett, the Court has already decided these claims on other grounds, so will not do so again here. As for the Village Clerk, the statutory rights guaranteed by New York's FOIL provisions

are not constitutional, thus their violation cannot serve as a predicate for <u>Monell</u> liability. <u>See</u> <u>Putnam</u>, 221 F.3d at 840 ("[T]he First Amendment . . . does not provide blanket access to information within the government's control."); <u>Nicholson</u>, 344 F.3d at 166–67 (requiring the deprivation of a constitutional right for municipal liability under <u>Monell</u>). And as for Plaintiffs' claims regarding Village police officers, these claims are wholly conclusory, as Plaintiffs have submitted no evidence with regard to police training at all. Hence, Plaintiffs' failure-to-train claim must fail.

### iii.  Unavailability of Village Codes

Finally, Plaintiffs allege that they were denied access to the Village Codes, in violation of their First Amendment rights.[12] <u>See</u> Pls.' SMF at 2; <u>see also</u> <u>Globe Newspaper Co. v. Superior Court for Norfolk Cty.</u>, 457 U.S. 596, 604–05 (1982) (articulating a First Amendment right of access to government proceedings and information). But Leonard confirmed that the "hard copy of the codes are always available in the Village Hall." Leonard Dep. at 39. Additionally, Plaintiffs admit that the Village supplied them with the full code in 2015, and prior to that they only sought to obtain the code by emailing and calling several officials. <u>See</u> Macera Dep. at 56, 58. With the code available in hard copy, the Court finds that Plaintiffs suffered no First Amendment injury.

### B.  Motion to Amend

In addition to filing a Motion for Summary Judgment, Plaintiffs also filed what purported to be a Motion to file a second amended complaint that same day. Mot. to Am. Plaintiffs appear to have filed this Motion under the mistaken impression that they needed to file a copy of their

---

[12] To be frank, Plaintiffs' evidence on this point is befuddling. <u>See, e.g.</u>, Pls.' SJ Mot., Ex. 6 (a 2017 screenshot of the Village of Ilion website displaying links to various sections of the municipal code). Without clearer evidence, this argument does not warrant more analysis.

original Amended Complaint with their Motion for Summary Judgment. <u>See</u> Pls.' SJ Reply at 6–7. The Court has reviewed the purported Motion to Amend: the proposed second amended complaint is identical in substance to the Amended Complaint Plaintiffs filed in April 2017, save for two exhibits that were not appended but were filed separately in support of Plaintiffs' Motion for Summary Judgment. Thus, to grant this Motion would not affect the substance of this dispute. For this reason, Plaintiffs' purported Motion to Amend is denied, with the understanding that the Court has looked to Plaintiffs' Complaint and April 2017 Amended Complaint for the purposes of this Memorandum-Decision and Order.

## V.    CONCLUSION

Throughout the course of this lawsuit, Plaintiffs have made myriad serious allegations of government misconduct. The Court takes these allegations seriously, but many of them do not belong in a suit for damages brought under § 1983 when there are robust Article 78 proceedings and injunctive relief available in New York state courts.

Accordingly, it is hereby

**ORDERED**, that Plaintiffs' Motion for Summary Judgment (Dkt. No. 113) is **DENIED in its entirety**; and it is further

**ORDERED**, that Defendants' Motion for Summary Judgment (Dkt. No. 110) is **GRANTED** in its entirety as to Defendant Parisi and in part as to Defendants Trevett and the Village of Ilion, excepting Plaintiffs' First Amendment retaliation claim over the events from March 2016 to July 2016; and it is further

**ORDERED**, that Plaintiffs' Motion to Amend (Dkt. No. 112) is **DENIED**; and it is further

**ORDERED**, that the Clerk shall terminate Defendant Parisi from this action; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:  September <u>30</u>, 2019
Albany, New York

Lawrence E. Kahn
U.S. District Judge